For argument this morning is 14-1812 Rembrandt Social Media v. Facebook. May it please the court, your honors, we have several issues on appeal. I think that the panel can best understand the bulk of the appeal by understanding two key points. Number one is, what is the division of labor between the browser and the applet, the helper to the browser? Could I ask a procedural question before we get there? We have findings here, both of non-infringement and invalidity. If I understand correctly, the invalidity issues came up as a result of a defense rather than a counterclaim. If we were to reject your position with respect to infringement, would that resolve the case? Such that you wouldn't have to reach the invalidity, is that what you're saying? Yes. I think it could potentially. I obviously argue that there is infringement, but I don't think that you would have to necessarily. But I think that may be a better, I think my opponent may have a stronger interest in the answer to that question. Well, I'm going to ask him. Great. We have the authority then to determine whether or not, in an instance where there's an affirmative defense as opposed to a counterclaim with regard to the issues, is it your understanding that it would be our discretion as to whether or not we would entertain? I think there's not independent jurisdiction for the validity finding because there's not a counterclaim. What would be the forward-looking, issue-preclusive effect on your client of leaving unreviewed the invalidity judgment? I don't think there would be. There may be... Are you confident enough about that to say, to tell us not to decide the question? You want us to write an opinion that says, we affirm on the grounds of infringement, we don't reach the other thing. Well, I want you to write an opinion that says the other thing. No, no, no. Yeah, I understand. Under this hypothetical, you'd want us to write an opinion that said, we're not reaching the invalidity thing, which would solve the collateral stuff. I prefer that over an affirmance of the invalidity, of course. But as I stand here, I'm not real deep into the issue because we didn't brief it, but I understand the concerns. So, can we talk about the 315 issue, as long as we're sort of starting there, if you're one... Sure. So, it's your view, though, that we don't, even if it were a counterclaim, or even if something were to arrest, we're precluded from reviewing that because it was part of the, decided by the IPR. I think that's right. And I think that a recent case of last week, MCM versus Hewlett-Packard, I think makes that stronger. I think it actually, there's probably two parts to the 315 issue. Number one, is there some sort of interference? Number one. And then part two is, what does the word estoppel mean? What's the practical effect of the estoppel? We're looking at the statutory estoppel now. We're not looking at other... I mean, we're looking... Can I just ask you, where would one draw the line then? I mean, your friend is making the argument that it's not asserted, because we're done with the jury, we're up here on appeal, and it's not asserted. And your view is, no, no, no, no, no. I mean, if, let's assume we were rocket docket, just like E.D. Virginia, and we had already, by the time the IPR concludes, we've already 36'd this case, affirmed 36, including the validity determination. Unless we ask for a response, the proceeding just allows for you to come up and file a cert petition, but at least in a petition for a hearing, there's no... They likely would not even respond. Would it be your view that that would not be too late? That's correct. I think... And I think there's some guidance. So if we had decided it already, even if the mandate had not issued, then you would concede that this would trump anything done by the IPR? I think this court's law suggests, at least, I realize this situation hasn't come up, but I think this court's law at least suggests that we're looking at finality, Supreme Court finality, before the litigation side is immune from challenge. Oh, so you're saying, no, that it wouldn't be, that would still be too soon, and the only way there would be finality would be once the time ran for cert? I think this court's case law suggests that, at least. Now, of course, we don't have that here, but I think that would be suggested by some of the cases by this court. I realize that they don't have to do with this particular type of statutory estoppel, but it suggests that the litigation is not final and unattackable until that. And Congress put in place a timing mechanism for when this is triggered. Now, I realize that my opponent argues that collateral estoppel has all of these precepts to it. We're not arguing that. We're saying Congress put in the trigger, and then we're looking at collateral estoppel for what does it mean to estop someone? Because we think, just like any law student knows the difference between claim preclusion and issue preclusion, any law student, and probably two-thirds of Congress, know what collateral estoppel is, and that that's what Congress intended when they said estoppel, and used the classic language that courts use for estoppel. Two-thirds of Congress knows what collateral estoppel is. Well, fair enough. But if we disagreed with it and we went forward and affirmed the finding here, would that wipe out? I mean, we've still got this other proceeding that will presumably be appealed to us. Does that, in essence, move that proceeding? No, it doesn't. That should come up, and they would have a chance to ask for a reversal there. What it means, though, is... No, no, no. I'm talking about, if we affirm the judgment of invalidity in this case, then what happens to the IPR case? Is that effectively moving? I mean, we're not going to then decide the case, having decided that the patent is invalid. We don't then decide whether the court was right. So we haven't talked about that, but I would expect there'd be either some agreement by the parties or motion practiced in that appeal, similar to the motion that we filed here, although probably before the briefing, not after the briefing. The same claims are at issue, is that right? That's right. If the... Well, there are broader claims at issue in the IPR because they challenged all those independent and intervening dependent claims on the way to the... They had to challenge, what is it, 4, 20, and 26. But invalidity of the claims currently before us would or would not fully resolve the question of what they call over there, unpatentability of all the claims at issue over there. If there are more claims at issue over there, then our ruling here would not, in fact, move that. I'd have to look at it, but... I mean, you might want to... On your question of what claims are, if the decision is that this... And on my feet, I don't want to admit that, but if the decision here is that the issue is preclusive, the claims here are 4, 20, and 26. There's a couple extra claims in the Patent Office, but they're broader than 20 and 26 because they're the intervening dependent claims. So they might fall. They might fall, too. Okay. Do you think this... I mean, I think Congress recognized, obviously, it showed some preference for stays, but they recognized, certainly, that not all district courts would be staying cases for very good reasons. Is this just aberrational because we've got such a rocket docket going here? I mean, is this... Or is it your view that this could happen repeatedly, or is it just a matter of timing, the extraordinary timing in here? It could happen in any court with a fast docket, but it's not going to happen in a court, probably, with a slow docket. But that doesn't mean that... I wouldn't call it aberrational. I think it is something typical in a fast docket court. And there are reasons why things could get held up in the Patent Office. There's rehearing petitions and so on, so that that could come after a trial. They're not required to... You've heard they're required to finish in a year. Can we ask for reconsideration on an IPR? You can. Can you go to a reconsideration? But they didn't hear. Right. So, presumably, if there had been reconsideration at the Patent Office, we might very well... That's my understanding. And I don't think the Patent Office treats that as part of their... That window that they take very seriously about getting the IPRs. I wasn't sure whether they could ask for reconsideration. This case would be unusual in one respect, and that is, it seems to me, that where there's district court litigation going on and an IPR request at the Patent Office, normally, you would include the prior art that's before the district court as well, right? So it's just kind of unusual not to include the prior art that's before the district court. I would say, normally, what you would and should do is, if you're going to file an IPR, you take your paper prior art to the Patent Office. You take your non-paper prior art to the trial. That is really what we believe Congress intended. They probably would like all the prior art to go to the Patent Office, but they can't as a practical matter because the Patent Office can't investigate on-sale bars and that type of thing. But I think that the practical thing that Congress was trying to get here was, you take everything... If you want to take an IPR, you take your paper stuff. So the answer to my question would be unusual to initiate an IPR that was limited to part of the paper record. I think it would be a bad idea. Well, yes. Because you could get a stop. It would be unusual for that reason. Yes, exactly. And I don't think anybody who is thinking this through would use the same art because of the problem that would come up from the estoppel. And I think people understand this estoppel as being something that could kick in at any time and shouldn't kick in very quickly because of the one-year limit that the PTO has on resolving these matters or 18 months if you include the petitions phase. So how about infringement? Infringement. While there's two aspects to infringement, the main aspect is the word assemble and what assemble means and how it's been construed. And in sum, the assembly requires you to put together the page definition. Not the display page, not display the page, but to assemble so that you have a page definition. And that's, I think, where both the JMALs are... But the browser is not the browser looking elsewhere to get the page definition in part. No. No? No. Because the browser cannot affect what is displayed. It gets a URL that tells it what it has to get to make the display. But that URL, whether it's a JPEG for an image or a CSS URL for Cascading Style Sheet, that is set. Once it gets that, it goes and gets what it's told to get and that's it. So it's a lot like if you think about blueprints and a specification for a construction project. The blueprints and the specification are the definition of that project. The physical manifestation of the project, the 2x4s and so on, that's the actual manifested physical thing, but it's not the definition for the thing. So, for example, if you cut off your project after blueprints and spec were finished, you'd still have a page definition, but you wouldn't have a building. Just like they don't have a page. Because I thought that the Facebook app or whatever it's called here only got part of the way toward a complete page and that it didn't include instructions that would produce a complete page, that the browser had to go elsewhere to get the rest of the instructions. To get the displayed page, yes, but that's different than the page definition. So the page definition has a link to a picture, for example. So you post to your friends, look, here's my dog. And your picture is stored somewhere on the internet at www.facebook.com backslash judgedyke backslash dog.jpg. That is handed to the browser, that link that tells it where to get the picture for display. But the browser makes no decision about what to get. It does exactly what it's told. Just like if you give a construction worker a blueprint that says put the 2x4s here, they put them there. There's no judgment by the browser. What it gets is for the display and parsing and rendering of the page. But the big pipe in their embodiment, and actually in our own patent's embodiment, passes the link to the browser, both in our patent and for Facebook, passes a link and the browser goes and gets what the link points to. And that's not disputed. What they dispute is, well, your patent doesn't show that for style sheets, for cascading style sheets. But that's kind of irrelevant because their whole premise of their case was that the browser can't get anything. And once our patent says, well, our browser and our patent can get things, and Goldbeck, or Dr. Goldbeck's point... Is your suggestion that the big pipe tells the browser where to get the rest of the information? For the display, yes. What do you mean for the display? Well, so I'm distinguishing... What doesn't it get? What doesn't big pipe tell the browser what to get? It tells the browser everything to make the page. But it doesn't give it the bits that allow it to display the page. It points it. It specifies where the image, for example, is, or where the cascading style sheets are. But it does not give it... Tells it where to get the content of the page, but not how to display it. Is that what you're saying? Yes. It doesn't do the display. It's a page definition. It's not the page itself. It's not the physical instantiation of the page. It's a definition of the page. And that's what the claim construction requires. But does the definition of the big pipe stage specify not just all the content that's going to be on the displayed page, but every aspect of how that page will look? It does, because it points to the style sheets, which are directed to what your question is now. So there's no aspect of page design that is left for the browser to select? No. In fact, we do have a testimony from Judge Goldbeck, which I think is undisputed on that point. Let me dig that up so that you can have... I think it's Goldbeck testimony at 10705. And what she says there is that the browser cannot display anything that's not in the page definition it receives. Now, it has bits that it goes and gets, right? Explain the cascading sheet business. Okay, so this cascading style sheet is... If you use Word and you can set up styles in Word and say, you know, every time I have heading one, I want it to be bold and so on. That's kind of what cascading style sheets do for a web page. So you'd say, instead of having to define every piece of content in the page and how it's going to look when it's displayed, a cascading style sheet kind of provides a style sheet just like in Word for that. But that style sheet is pointed to by the link that BigPipe gives to the browser. So it's just like an image. The browser follows that link, goes and gets the image, brings it back. Same thing here. Browser follows that link, goes and gets the style sheet, brings it back. So it's defined in what BigPipe gives them, and that's why it's a page definition. It's not the physical instantiated page, and this is really... Where's the testimony that says that you get the complete content of the page? Well, I think part of it's from Goldbeck saying at 705... Okay, show us where on 10705 she says that. Is that your expert or theirs? What's that? Our expert. They didn't have an expert on this, if you remember. They withdrew their expert after the leading questions from the court. We'll get to that if we have time. At the bottom, the lower left corner of 10705... Page 26. Yes. You look at the question at the last line. Can the browser display anything that's not in the page definition? Answer, it cannot. And there is no... That's the sum and substance of it? Well, I think if you go through her direct, you'll see where she talks about the joining of the content and how those links are followed, but I thought directly to your point about, is there anything coming from anywhere else? The answer is no, because the browser can't go and get anything that BigPipe doesn't tell it to go and get. Some of the confusion here... The fact that the browser can't display other things doesn't mean that in order to display the content that you don't have to use the browser to get additional information. I think the statement is the browser gets what it's told to get by BigPipe and nothing more. Well, that's not exactly... That's not entirely clear. Okay. Well, I think they ask, can the browser display anything that's not in the page definition? So the page definition is what is coming from BigPipe over the browser. And the question is, can it display anything that it doesn't get from that page definition? And her answer is, no, it can't. So I think a lot of the confusion around here is that the claim term is assembling a diary page. Yeah, can I just ask about that? Sure. Is there... I'm confused about the relationship between page definition and cohesive diary page putting aside some back and forth references between the two patents. Is there some difference between these? Or is there a dispute about whether there's a difference? Because while the page definition seems to say one thing, the cohesive diary page talks about assembling or putting all the content in the page design are fully integrated for display, forming the cohesive diary page by combining the content data with the page design. What's the... What's the relationship between these two different terms? Don't worry, I've been confused by the connection. You have to go to the claim constructions of the court to figure this out. And both... Claim constructions for both patents point to the page definition. In the 316 patent, it's the construction of assembling that whole clause. And you were just reading the beginning of that claim construction, but the end of it was to generate a page definition. And so what you're doing in the assembling, when you look only at the claim, it says you're assembling a cohesive diary page. But when you look at the claim construction, you're generating a page definition. So what that does, when you say cohesive diary page, a web page is a somewhat vague term because you could be talking about the code. You'd be talking about what you see on the screen. And what the claim construction does is it resolves the ambiguity. Are you talking about the HTML code that goes into it? Or are you talking about the thing you see on the screen? And when the court says page definition, it's saying this isn't the displayed page. This is the HTML code that defines what will be displayed. And that's where we went off track at the trial with Mr. Parker because he was on the stand as a Facebook engineer and never read this patent. And he gets asked about assembling a cohesive diary page. No mention of page definition. So he's sitting there saying, well yeah, the last thing to display the page is the browser. So yeah, the browser for Facebook assembles the cohesive diary page. He was never told, and in fact we tried to tell him, but the judge wouldn't let us, that the definition for assembling a cohesive diary page involves assembling the page definition. I don't think anybody's really disputing that the page itself doesn't come from BigPipe. It's the instructions that come from BigPipe. But the problem is that the instructions that come from BigPipe aren't sufficient to display the page. That you need something beyond that which the browser secures from someplace else. Sure. They're sufficient to define the page, but they do not display the page. And that's the distinction that... I mean, how do I know that that distinction is made in the claim construction? First of all, that they go with page definition. We have Goldbach, who because they withdrew their expert, and by the way, they did not withdraw their expert after Goldbach testified. Right before lunch, and just after Parker had testified, they said we're calling our expert after lunch. We then had 30 minutes of argument. Help me with the claim construction, because it doesn't seem to me that it's obviously apparent that the claim construction doesn't require that the BigPipe not only tell you what content to put on the page, but how to put it on the page. Sure. And you agree that it doesn't tell you how to put it on the page. How to display it, correct. Yeah. The reason I made that distinction is because page, again... How to put it on the screen. How to put it on the screen, yes. Right. And so Goldbach... How do I know that the claim construction doesn't cover what you agree that BigPipe doesn't do? I wouldn't say it doesn't cover it, because we've got this thing flipped about what the browser's supposed to do. The claim is about what BigPipe is supposed to do. And so the question is whether this claim covers BigPipe. We're not trying to narrow it. You're not helping me. Let me try again. What you say is the claim construction here means just page content and not display mechanism. How do I know that? Okay. So number one, you can look at the language of the claim and the claim construction that Judge Toronto read was for assembling the page, excuse me, assembling the diary page. And I'm in claim one of the 316, just as the example. It says, forming the cohesive diary page to be displayed by combining at the time of display the content data with the page design to generate a page definition. Okay. So the page definition is generated by this combination. And there's no dispute that the combination occurs by BigPipe. That these two pieces come down, the outline information and the content information, and that BigPipe processes them for combination. Okay. And so the claim construction itself makes that clear. Now, if we go further, if you look at the patent itself. The term content data is information that may be displayed to a design. That sounds, maybe this is a concrete way, that sounds like the picture, rather than the specification of where to find the picture. And the BigPipe is not, at the time of display, combining the picture with the design. And I think that it's broader because of the term with the information in there. But I'll also point to court that the construction, and I think maybe the best place to go for something that's more black and white, if you go to the 362 patent, and it's incorporated by reference in the 316. At the bottom of column 10, top of 11, this is the example of the patent itself working, and it says, well, the second sentence of the paragraph that spans column 10 to 11 in the 362 patent, so it's A135. It says, otherwise, the section manager in step 1165, so the section manager is the thing in the patent that pulls these pieces together, in step 1, generate means generates, page definitions for the section, based on the template, the universal addresses, URLs, and the annotations, i.e. the results of the examinations performed by the module. Here's the key part. Step 1165 further includes a step of generate web pages based on the page definitions, which includes downloading the objects identified by the universal addresses in the page definition. So the browser here, in our patent, is going and getting things based on links, URLs. If I understand your point, this language makes it impossible to say that the page definition requires the actual picture. Unless you want to go back to the patent, yes. And Goldbeck explained that. Did you make this argument in your brief? I believe we did. I don't know exactly where that would be. I can take a look. We do cite this passage and say that it's in existence. When you get up to do your rebuttal, I'd like to know where in the brief you made this argument. Thank you. Okay, we're way over time, and we'll restore four minutes of rebuttal, so why don't we add ten minutes to Mr. Hunger's time, only if he needs it. Thank you, Your Honor. May it please the Court. Turning first to the non-infringement issue, we think the evidence is more than ample to provide substantial evidence in support of the jury's verdict of non-infringement. Counsel's argument is that the page definition is what BigPipe sends to the browser, but of course that's the question in dispute, and obviously Facebook strongly disputes that, and the jury was entitled to find otherwise. Counsel's argument overlooks the actual claim construction which Rembrandt stipulated to, and which they are not in a position to challenge, and which does not say what it would have to say in order for their arguments to be valid. The claim construction says that the definition, the page definition, is information that completely defines the appearance of a page. It's undisputed that CSS, Cascading Style Sheets, for example, is information that defines the appearance of a page that Dr. Goldbeck, Rembrandt's... Just so that, I mean, I guess I don't understand the specifics, but if BigPipe says, go get CSS number 1, 2, 3, 5, at that point has it not completely defined whatever contribution to appearance Cascade Sheet 1, 2, 3, 5 will in fact make? No, Your Honor, it hasn't defined, I mean, I would say no, any more than if you asked me to define induced infringement and I respond by saying 35 USC 271B and a string site of F3rd sites that I haven't completely defined what that is. So is there a little homunculus or something out on the land that the browser is collecting stuff from who's making choices about what's in fact going to go on in Cascade Sheet 1, 2, 3, 5? BigPipe doesn't make choices, Your Honor, the testimony is clear. BigPipe is merely a password. Let me try to be specific. There's nothing random, choice-based, un-algorithmic about the content of the style sheet, is there? There's nothing, no, there's nothing If BigPipe says, get this one, it has fully specified everything that the thing, that content sheet 1, 2, 3, 5 says. Well, to be clear, first of all, BigPipe what the claims require is assembly, right? You weren't talking about assembly. I just want to make sure that your question has, I think, an implicit premise in it that's not correct, right? The question is assembling the cohesive diary page by dynamically combining the content data and the page design. That's what Claim 1 says of the 316 patent. BigPipe isn't doing any of that. It doesn't do any assembly. It's just a pass-through. It doesn't have the content data. This is why I'm confused about, it seems to me here's a starting confusion. Your case is stronger on the other piece than it is on page definition and I'm trying to understand the relationship between these two things. The page definition I'm having a real hard time understanding what it is that appears on the screen that isn't 100% determined by what BigPipe tells the client. On the other hand there's this language about forming the page by combining the content data with the page design which seems like it requires the actual content to be there, more than the blueprint. It requires both. Yes, the content data and the page design information has to be there. In order to assemble it, you have to have it and indeed Dr. Goldbeck admitted that. In order to assemble and combine the information as the claim requires you have to have the information and BigPipe doesn't have it. I'm also having trouble understanding this. Are you saying that the actual content of the page is the result of the BigPipe instructions but that the design of the page, the way it appears there is something that the browser may get someplace else? Both are things that the browser must get someplace else. All BigPipe does is passes through a chunk of HTML then the browser takes that and parses it. Where is there testimony in here that supports the notion that BigPipe does not provide all the page content? The content? First of all, with respect to what content data is, Dr. Goldbeck testified on 10717 that it includes things like photos, going to the earlier discussions and text and so forth. Also, separate and apart from that, on that same page, she testified that page design, the other half of the equation that needs to be combined includes CSS. CSS, photos, those are design and content. And the page design doesn't come from BigPipe? Correct. The CSS goes directly to CSS. The browser has to go out to the server to download additional CSS. Does BigPipe specify the page design? Specify what CSS it wants? Well, again BigPipe doesn't want anything. BigPipe doesn't even read what it is passing through. It's merely a conduit. I thought the answer to that was that it does not tell the browser what to get from CSS. What BigPipe does is pass through the HTML, which includes links to A specified CSS? I don't know what you mean by specified. It includes links to CSS that the server that the Facebook server has placed in the code. And it doesn't leave it up to the browser to choose which style sheet to select? It's not up to BigPipe or the browser. It's up to the server. It's up to Facebook's content. So Facebook's server is choosing because it thinks it wants italics instead of Roman for this particular thing? Right, or ultimately whatever the user needs. Is some direction being given to the server that holds the CSS, the style sheet, which style sheet to send back? Yes. Where is that information coming from? The selection information? It's in the, as I understand it, there's a link in the HTML the browser takes that link. In the HTML that BigPipe has provided to the browser? It's actually more complicated than that because with CSS in particular, the record establishes that some of the CSS information is not in the link, is in the HTML. It's out on the server so the browser takes the link goes out to get the CSS. Does it need to fill out the address? No, this isn't the URL. No, this is different. This is at just for your information this is at page 10774 of the appendix. So CSS resources out on the server can contain links to additional resources so then the browser not the BigPipe, goes out to the server pulls down the CSS resources and those resources in turn tell the browser to go someplace else and get additional CSS resources. That's all part of the process of formulating the page definition, if you will, of defining the appearance of the page. And it's not told to do that by BigPipe? Well the instruction the second step of that process where the browser goes out to the server, gets the CSS file, parses the CSS file, follows the instructions in the CSS file to go someplace else to get additional CSS resources I mean that's, the browser's doing all of that. Not BigPipe. Right, so if I order a collection of books from the library I could care less if the local library needs to go and find volumes 2 through 4 at one of the affiliate libraries I say I want these books. I have specified everything I'm going to get back. And everything else is just internal mechanics of fulfilling my order. In what way is what I just said different from what BigPipe has supplied to the client which is then submitted to the because two responses, first of all page definition is information that completely defines the appearance of a page the information that BigPipe passes on does not completely define the appearance of the page because we know from the broken page illustration on page 7 of our brief that's what the information that BigPipe sent if rendered by the browser without the browser going elsewhere to do more things, that's what would be displayed and it's not the page. It's not the cohesive diary page. Dr. Goldbeck admitted that the cohesive diary page is the pretty picture with all the content and all the styles that's on page 8 of our brief that is what a Facebook page looks like that's the cohesive diary page that's what needs to be assembled and that's not what BigPipe is assembling because what BigPipe sends out doesn't give you that only what the browser does after the fact after it goes out, performs all these additional steps can give you that and Rembrandt stipulated to the construction of page definition and we haven't even talked about with respect to the 316 patent the other areas in which their evidence falls short of establishing infringement, namely the fact that it has to be assembling a cohesive diary page which is a page in which content and design are fully integrated for display and clearly did you argue either here or below that there was some difference between the page definition requirement and the assembling cohesive diary page requirement that is that even if we argued both very explicitly and repeatedly that neither the page definition requirement nor the cohesive diary page fully integrated for display is satisfied we also argued separate and apart from both of those two points that an additional claim limitation is not met which is the requirement that the assembly occur at the time of display and here obviously it's not occurring if you assume for the sake of argument, which we disagree with that BigPipe is doing assembly it's not doing it at the time of display because after BigPipe has done everything it does and has passed off as a conduit to the browser, the browser has to do all these additional steps before it can display so what the browser is doing is at the time of display not what BigPipe is doing which is a separate and independent reason why this particular 316 patent is not invalidated and then there's also the fact that Is it your view that these claim constructions simply make the passage at the bottom of column 10 top of column 11 that we were reading at the end of Mr. Dragsaf's argument incorrect or these supersede them and they just It's an unembodied excuse me, it's an unclaimed embodiment and I would also note it refers only to content that specification even in discussing that particular embodiment makes very clear that the formatting information, the configuration information that controls the appearance has to be downloaded by the applet and I would direct the court's attention that's on the previous page of the appendix of the patent column 7 on page 134 of the appendix in the middle of the page line 32 it says the diary applet, that's according to them, BigPipe includes a section manager for retrieving the template i.e. a presentation context and presentation context is construed by the court to mean the same as page design it's what defines the appearance of the page or what determines the appearance of the page so the diary applet has a section manager for retrieving the template i.e. a presentation context corresponding to the template ID for a section so the diary applet, allegedly BigPipe is what's going out and retrieving the page design or the presentation context but BigPipe, indisputably, doesn't do that, that's what the browser does in the accused system, so again, even if you reconstruct the page, excuse me, even if you're going to reconstruct the claim construction by going to the specification, which we submit is improper and triply waived because they stipulated to the construction they didn't object to the jury instructions to the jury they refused the judge's invitation to ask for further clarification of their point and they haven't appealed from the claim construction so all those are waivers they have no ability to challenge the claim construction or ask for further clarification of the claim construction at this point and therefore they can't go into the specification to try and vary or modify the claim construction but even if you did that the specification itself in column 7 shows that the applet has to be getting the formatting information, what determines the appearance of the page and BigPipe doesn't do that The presentation context is construed to be layout or style information that defines at least in part the visual appearance of a page, independent of a particular so that's not the complete design does your applet not go out and get BigPipe doesn't go out and get BigPipe again is just a pass through it just passes through the HTML to the browser it doesn't go out separately it doesn't download any formatting information separately, any downloading of additional formatting information is done by the browser but it defines the way that the visual appearance of a page at least in part well right, but in order to assemble the cohesive diary page or in order to you've got to have the configuration information I'm trying to understand what you urge us to make of this column 7 line 32 material the point of the column 7 line 32 material your honor is that it shows that again even if you ignore their waiver of any attempts to modify the claim construction and their arguments about trying to modify the claim construction based on the specification which is far too late and is waived what that information shows is that the embodiment that they're trying to argue about requires the applet to download the page design or the presentation no it doesn't it says the presentation context which is defined as in part defining the page design not all of it yes your honor but that's the same as my point is presentation context and page design are the same and what they have to do what the patent requires the applet to do is generate a page definition for the presentation of the object that is the content the page definition being generated from the presentation context and the AUA and again the page definition has to completely define the appearance of the page so there's no so whatever the specification says in this respect the judge's objective to construction requires completion exactly fully integrated for display and completely defined the appearance of the page that is information that completely defines the appearance of the page the information that comes out of big pipe does not completely define the appearance of the page because when you render only what comes out of big pipe you don't get the page, you don't get the pictures you don't get the appearance you don't get any of that everything has to be done afterwards and again they could have asked they could have made these arguments to the judge and asked for a claim of construction and the judge then would have ruled on whether or not the claim should be construed to make specific what they are arguing but they didn't, they waived all that so they agreed this can go to the jury under this claim of construction the jury was perfectly within its rights to conclude well, completely define the appearance of the page it sure doesn't look like that to me because the page isn't there and what big pipe says isn't defining the page to me it's not a complete definition if you've got to go do a bunch of more research and that's what before your time runs out can we move back to where we started with your friend which was the first question I think that Judge Dyke posed validity was an affirmative defense in this case and not a counterclaim why do we even need to go there assuming hypothetically that we were to affirm on infringer well if the court were to affirm on I would have an interest in also having affirmance on the issue of invalidity but I guess if Rembrandt is saying that in those circumstances they would abandon their appeal on invalidity then if we did not review the invalidity judgment would that judgment have any forward looking preclusive effect against Rembrandt I don't know the answer to that well clearly it would not if we said we're affirming on infringement and not reaching invalidity well I think so Rembrandt I would think has an interest in challenging the invalidity of their patents if they're now saying we're willing to withdraw that appeal there's no final judgment it boots it up our final judgment would say we don't reach the issue if the court doesn't there might be some dispute about that in subsequent proceedings I think it's pretty clear about it that if you have an appeal which affirms on ground A it's not preclusive as to ground B which it didn't reach well if as I stand here I don't want to waive any arguments that Facebook may make in subsequent proceedings but obviously if the court are you prepared to agree to a vacater of the invalidity judgment if we affirm on non-infringement as I stand here today I'm not in a position to do that well first of all there's the IPR proceeding we can't rule out the possibility that Rembrandt might choose to try to assert claims in some future circumstance so yeah I think but in order to say even if we kept the validity question here then we're confronted with the interpretation of 315 which is a harder question too well and that's as to one of the patents correct is there a clear explanation in the record as to why you asserted four pieces of prior art in the IPR I guess and completely different prior art in the district court proceeding there's none in the record your honor and the IPR remember this was in the rocket docket the case was originally scheduled for trial after 8 months or 10 months but less than a year so Facebook didn't even file an IPR until the trial was taken off calendar and there was an interlocutory appeal and it wasn't clear how long things were going to take and Facebook then filed the IPR while the case in the district court was stayed which was long after expert discovery I thought there was no stay here only during dependency of the interlocutory appeal and so it was only filed at that point which was many months but that's not a real answer you might not know but that's not really a clear answer for me at least as to why they didn't assert the same prior art in both proceedings right the record doesn't reflect my point was only that the IPR was filed in February whereas expert discovery closed in August I believe of the previous year so it was 6 months or more later so maybe but here you had the jury trial before they instituted I mean within the first 6 months of filing correct because the interlocutory appeal was denied the judge immediately set the trial date and it's a rocket docket things were off and running if the court has no further questions on non-infringement if I still have time remaining I'd like to spend a few moments on the section 315e2 issue only to say that we believe it's clear from the text of the statute even leaving aside the issues of constitutional avoidance that congress did not purport to bar this court from affirming an invalidity verdict entered by the district court and is that because of the assert or because of the 1338 site both of those and more your honor the facebook is not asserting invalidity it successfully established invalidity in the district court and it's simply defending a judgment the statute talks about civil actions under 1338 not appeals under 1295 which obviously congress could have done if it had intended to apply estoppel in cases already on appeal and there's also the ITC point your honor Rembrandt's interpretation would lead to the absurd result that ITC determinations are given greater finality and greater respect than the final judgments of article 3 district courts because it's clear that in the context of ITC proceedings estoppel arises only if the PTAB decision comes down while the case is before the ITC not if it's pending in this court on review of the ITC determination so it would be bizarre we submit for congress to have adopted a statute that that produces that strange result and the text that strange result isn't the right result because it's strange I'm sorry your honor you could argue that that strange result is not the right result from the very fact that it's strange in other words that in ITC proceedings that going after the patent on appeal should also create a problem I'm sorry I'm not sure I followed why in heaven's name would congress want to distinguish between situations in which someone is asserting invalidity at the trial level and asserting invalidity on appeal well again we don't think we are asserting invalidity on appeal we're defending a final judgment of what makes sense to distinguish is because what congress envisioned the IPR procedure to do is to provide an expeditious way for a resolution by the agency in a way that would obviate the need for costly and time consuming and expensive litigation of that issue in district courts or in front of the ITC or maybe it's like what Judge Ellis said about the damages you make your choices you live with them but again that begs the question your honor well what happens if here let's assume you've drawn a very slow panel and lots of controversies on infringement so there's a practical matter you're not gonna get your opinion for a year and in the interim since we haven't decided the case and we've done nothing we've got a pending appeal from the IPR and let's assume that's a better quicker panel and they decide the IPR and were to affirm the IPR before we decide this case this court has already said that a determination in one proceeding that the claim of invalidity has not been established does not resolve the question whether in a separate proceeding so that wouldn't make any difference right because there's different evidence indeed in this particular circumstance the patent office adopted the PTAB adopted a different claim construction in fact they adopted a different they essentially adopted the district court's claim construction when they initiated and then when they reached their decision they changed their claim construction in a very material way and disagreed and narrowed the district even though it's the PTAB and supposed to use the broadest reasonable construction they adopted a narrower claim construction for invalidity purposes than the district court had used based on the stipulation of Rembrandt so it's a different claim construction it's different prior art so it would not resolve this appeal in that hypothetical in any event if the court has no further questions thank you Mr. Stike I have your sights blue brief 10 to 11 speaking of formatting information we got excited with ours here made the passage underlined bold and italicized that we're talking about see look we block quote that passage from the patent right at the top of page 11 of the blue brief and that's in the statement of the case and facts do you have anything yes 29 middle of the case middle of or middle of the page just above the heading the sentence it's about the fifth line I think it says and as previously described referring of course back to pages 10 to 11 the 362 patent specification which is incorporated by reference to the 316 expressly describes the browser downloading additional information identified by URLs in the page definitions when displaying the page there is no there are no examples in the spec in which a page definition does not reference external information thus any understanding of the construction page definition etc can't be right on my friend's point I think if you were to find that this claim construction was clear you've done that once with baking bread to 700 degrees I think that's a narrow rare situation I think the discussion we've had is made clear that the claim construction is not clear and if anything it points in our direction by saying a page definition but if you decide that the language of the claim construction is so clear that you have to exclude the passage in the patent we pointed you to then you'd have to do that now I want to point to the column 7 passage that is not inconsistent with what we point to all that says in addition to the point you made Judge Serrano all that says is that the an accused product like big pipe could form the page definition with the explicit material but it doesn't prevent it from providing a link that then links to the ultimate material so it's not inconsistent you can do one or the other you can either put all of that how it's displayed content in there or you can provide the link as your page definition so there's no inconsistency on the infringement point and a lot of the question the thing you have to remember is the only evidence we have here is Dr. Goldbeck because after the colloquy with the district court they pulled their expert and so they have no affirmative testimony what counsel here cited at 10774 is in the middle of this colloquy with the court what Mr. Parker said now here's the problem with Mr. Parker he was never told and was not allowed to be told what these claim constructions are he had never heard the word page definition and we tried to tell him that word to explain that the page definitions not final webpages the court refused to let us do that repeatedly in fact some of the objections were adopted under a rationale that it was exceeding the direct of course it was exceeding the direct because Facebook didn't ask the question it was the district court that asked it on that point the question that was asked of the witness had the word assembly in it and it basically said so your browser does the assembly and big pipe doesn't that is the ultimate issue in this case that's the issue that's driven our entire day and most of our day here today it's the issue that drove the trial it was the ultimate issue asked as a leading question by the court to a witness who had never read the patent didn't know the claim construction for assembly and then followed up by the court with a statement of well if I think if it's not clear I think we can move on or something to the effect of I think I've asked enough questions here move on we tried to move on or we tried to get a sidebar the court said no we tried to ask questions that used the claim construction not the word assembly but the use of the word page definition which is key to our case we were prevented from doing that and we think that that with everything we've said today about the JAMAL issues that they never put in any evidence on this point but that the unfairness that was exhibited by the district court and how that led the jury to conclude that our case was not a good one on this key central point the one point I will make though is if you want to see more evidence of Goldback that I wasn't able to give you before Judge 10-686 and 10-690 and the kind of continuation of those is really where you see her talking the most about that any other questions? No. Thank you. Thank you. We thank you. That concludes our proceedings for this morning. All rise. Order. The open court adjourns tomorrow morning at 10 a.m.